IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-00133-LTB-MJW

JANET O'DONNELL,

Plaintiff,

v.

MICHAEL J. SULLIVAN; and
TRIPLE CROWN SERVICES COMPANY,

Defendants,

INNOVATIVE HEALTHCARE FINANCING GROUP, LLC,

Intervenor.

---

**RECOMMENDATION ON
MOTION FOR PARTIAL DISBURSEMENT OF REGISTRY FUNDS (Docket No. 153)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**

This case is before this court pursuant to a Supplemental Order of Reference (Docket No. 162) issued by Senior Judge Lewis T. Babcock on May 24, 2012.

**I. PROCEDURAL BACKGROUND**

This is a personal injury case which was removed from Weld County District Court on January 21, 2010. After a lengthy and contentious discovery process, and after the withdrawal of several attorneys, a Notice of Settlement (Docket No. 119) was filed on July 21, 2011, one month prior to the scheduled four-day jury trial. Shortly thereafter, an unopposed motion to deposit the settlement proceeds into the court registry was filed and granted (Docket No. 122 & 123). The full settlement amount of

2

$57,000 was deposited in the court registry on September 8, 2011 (Docket No. 135).

On January 25, 2012, Innovative Healthcare Financing Group, LLC ("Innovative") filed a Motion to Intervene (Docket No. 145).[1] The motion was granted on February 16, 2012 (Docket No. 151).

## II. PENDING MOTION

Now before the court for a report and recommendation is Innovative's Motion for Partial Disbursement of Registry Funds (Docket No. 153) filed on February 22, 2012. Plaintiff Janet O'Donnell filed a response to Innovative's motion on March 15, 2012 (Docket No. 158). Innovative filed a reply on March 29, 2012 (Docket No. 159). A surreply was filed by plaintiff on April 6, 2012 (Docket No. 160). In addition, this court held a hearing on Innovative's motion on June 13, 2012. During the four hour hearing, the court heard testimony from plaintiff, Michael Bumann, and Richard Leslie.

The court has carefully considered Innovative's motion, plaintiff's response, Innovative's reply, and plaintiff's surreply. In addition, the court has taken judicial notice of the court's file, and has considered the applicable Federal Rules of Civil Procedure and case law. The court has also considered the testimony and credibility of each witness who testified at the June 13, 2012 hearing, and each of the admitted exhibits. The court now being fully informed makes the following findings of fact, conclusions of law, and recommendations.

Innovative seeks disbursal of funds in the principal amount of $23,132.50, plus attorney fees in an amount to be later determined. Innovative argues it is entitled to the

---

[1] Innovative had previously been joined in the matter on October 4, 2010 (Docket No. 68). Innovative was later dismissed on November 3, 2010 (Docket No. 82).

3

disbursement pursuant to a Subrogation and Authorization Agreement (the "Agreement") (Innovative Mot, Ex. A) entered into between plaintiff and Innovative on November 6, 2008.  An explanation of the genesis of the Agreement, the relationship between the various interested parties, and the circumstances leading up to Innovative's motion is warranted.

**A. Factual Background**

In November 2008, plaintiff sought medical care for injuries sustained in the automobile accident central to this matter.  Among the health care providers involved in plaintiff's medical care were Loveland Surgery Center ("LSC"), North Colorado Anesthesia Professionals ("NCA"), and Hope Therapy Centers ("HTC") (collectively the "Providers").  Plaintiff presumably did not have health insurance and would be required to pay her expenses out-of-pocket.

Each of the Providers had a preexisting contractual arrangement with Innovative wherein Innovative would purchase accounts from the Providers related to the treatment of individuals who sustained injuries as the result of another person's wrongful acts.  Uninsured individuals would then receive medical care from the Providers, and in exchange Innovative would receive a subrogation right to recover the cost of the medical care from the proceeds derived from the individual's legal claims.

Plaintiff entered into such an agreement with Innovative on November 6, 2008.  Subsequently, plaintiff received medical care from: (1) LSC on November 11, 2008 totaling $19,582.50; (2) NCA on November 11, 2008 and February 10, 2009 totaling $2,720.00; and (3) HTC on January 29, 2009, February 4, 2009, February 17, 2009, February 23, 2009, and March 10, 2009 totaling $830.00.  In all, the Providers billed

4

$23,132.50 for plaintiff's medical care.  Plaintiff filed her personal injury suit in state court on December 22, 2009.  The case was removed to this court on January 21, 2010.

Initially, plaintiff was represented by the law firm Bachus & Schanker, L.L.C.  On July 14, 2010, Bachus & Schanker withdrew its representation, apparently due a disagreement with plaintiff over whether to accept a particular settlement offer.  Plaintiff proceeded *pro se*.  Shortly thereafter, defendants filed a Motion for Sanctions (Docket No. 40) and a Motion to Compel (Docket No. 45), and this court enter an Order to Show Cause (Docket No. 50) for plaintiff's failure to attend a scheduled settlement conference.

Meanwhile, Huff & Leslie, LLP, representing Innovative at the time, filed an action in state court on August 11, 2010 seeking to protect Innovative's interests in this matter.  Apparently concerned with the possibility that plaintiff's case could be dismissed due to the various discovery disputes and the show cause hearing, Huff & Leslie suggested that Innovative and plaintiff's interests were aligned and dual representation would be appropriate.  Innovative and plaintiff agreed, and each signed a Dual Representation Agreement.  Huff & Leslie entered its appearance in this matter on behalf of plaintiff on September 20, 2010.  The state case was dismissed shortly thereafter.

Approximately one year later, plaintiff and defendants reached a settlement agreement in a total amount of $57,000.  A conflict between plaintiff and Innovative over attorney fees owed under the Agreement ensued.  Thereafter Innovative intervened in this matter and filed the current motion seeking to recover the full amount billed by the Providers plus attorney fees.  Shortly after Innovative's motion was filed, Huff & Leslie withdrew its representation of plaintiff and plaintiff once again proceeded *pro se*.

**B. Analysis**

Innovative seeks to enforce the terms of the Agreement entered into with plaintiff. Specifically, Innovative points out that the Agreement entitles Innovative to the amount of billed charges by the Providers. Innovative also argues that because plaintiff has breached the Agreement, under its terms, Innovative is entitled to recover attorney fees incurred in enforcing the Agreement.

In response, plaintiff argues that both C.R.S. § 10-1-135 and the Common Fund Doctrine act to limit recovery by Innovative. Specifically, plaintiff argues Innovative should share in the attorney fees. However, plaintiff does not dispute the principal amount owed. Plaintiff additionally points to the terms of the Dual Representation Agreement arguing that it was intended that plaintiff and Innovative would share in costs and attorney fees. Finally, plaintiff argues that it would not be equitable for her to recover nothing from the $57,000 settlement.

**i. C.R.S. § 10-1-135 and the Common Fund Doctrine**

Under the common law, the Common Fund Doctrine is based on the equitable notion that those who have benefitted from litigation should share in its costs. Kuhn v. State, 924 P.2d 1053 (Colo. 1996). For example, a plaintiff who undertakes to recover medical expenses at his or her own expense, and whose health insurer claims a right of reimbursement, will be entitled to share the costs associated with the recovery with his or her health insurer. See Catellari v. Partners Health Plan of Colo., Inc., 860 P.2d 593, 595 (Colo. App. 1993).

C.R.S. § 10-1-135, which became effective on August 11, 2010, codified several

6

common law principles governing subrogation claims, including the Common Fund Doctrine. See Christopher P. Koupal, <u>CRS § 10-1-135 and the Changing Face of Subrogation Claims in Colorado</u>, 40 Colo. Law. 41, 41 (2011). C.R.S. § 10-1-135 is meant to "ensure that each insured injured party recovers full compensation for bodily injury caused by the act or omission of a third party, and that such compensation is not diminished by repayment, reimbursement, or subrogation rights of the payer of benefits." C.R.S. § 10-1-135(1)(c). Beyond the issues of full compensation, the statute is also "intended to require a payer of benefits to pay a proportionate share of the attorney fees when the payer of benefits is a beneficiary of the attorney services paid for by the injured party." C.R.S. § 10-1-135(1)(f).

Innovative argues that neither the Common Fund Doctrine nor C.R.S. § 10-1-135 are applicable to this matter.

First, Innovative points out that the terms of the Agreement state that the Common Fund Doctrine would not be used as a defense to payment of the contract rights granted to Innovative. Even assuming the common law version of the Common Fund Doctrine is still available in view of C.R.S. § 10-1-135, the court agrees that plaintiff has waived its availability. The Agreement expressly states that "[t]he Common Fund Doctrine does not apply to this Agreement and [Innovative] shall not be responsible for payment of [plaintiff's] attorney fees or costs for recovery of any monies owing to [Innovative] under this Agreement." Plaintiff testified during the June 13, 2012 hearing that she had read the Agreement and understood it. Further, there are no allegations of fraud, incapacity, coercion, or other defenses which could act to make the Agreement unenforceable. Contracts are to be given effect according to the plain and

ordinary meaning of their terms, and absent any ambiguity, those terms must be enforced as written. <u>Horne Eng'g Servs., Inc. v. Kaiser-Hill Co., LLC</u>, 72 P.3d 451, 453 (Colo. App. 2003). The court finds that the above quoted language unambiguously acts to make the Common Fund Doctrine inapplicable to the Agreement, and therefore plaintiff cannot avail herself of the protections afforded by the doctrine.

Next, Innovative argues that because C.R.S. § 10-1-135 was enacted to apply specifically to health insurance carriers and health benefit plans, it is not applicable to the Agreement since it is not an insurance policy or benefit plan. C.R.S. § 10-1-135 applies to "payers of benefits" which is defined as "any insurer, health maintenance organization, health benefit plan, preferred provider organization, employee benefit plan, other insurance policy or plan, or any other payer of benefits." C.R.S. § 10-1-135(2)(c)(I). "Benefits" is defined as "payment or reimbursement of health care expenses [or] health care services . . . provided to or on behalf of an injured party under a policy of insurance, contract, or benefit plan with an individual or group, whether or not provided through an employer." C.R.S. § 10-1-135(2)(a). Finally, an "injured party means a person who has sustained bodily injury as the result of the act or omission of a third party, has pursued a personal injury or similar claim against the third party, . . . and has received benefits as a policyholder, participant, or beneficiary from the payer of benefits." C.R.S. § 10-1-135(2)(b).

When interpreting state law, the Tenth Circuit requires that a court "look to rulings of the highest state court, and if no such ruling exist, [the court] must endeavor to predict how the high court would rule." <u>Lovell v. State Farm Mut. Auto. Ins. Co.</u>, 466

8

F.3d 1239, 1248 (10th Cir. 2005). No published Colorado court decisions have determined the applicability of C.R.S. § 10-1-135 to an agreement similar to the one between plaintiff and Innovative. Accordingly, the court must interpret the statute according to Colorado rules of statutory construction. See Ward v. Utah, 398 F.3d 1239, 1248 (10th Cir. 2005).

When construing a statute, a court must ascertain and give effect to the intent of the General Assembly. Springer v. City & Cnty. of Denver, 13 P.3d 794, 799 (Colo. 2000). To determine legislative intent, the court first looks to the statutory language and gives it its plain and ordinary meaning. See Fogg v. Macaluso, 892 P.2d 271, 274 (Colo. 1995). The court should "read words and phrases in context and construe them literally according to common usage unless they have acquired a technical meaning by legislative definition." Klinger v. Adams Cnty. Sch, Dist. No. 50, 130 P.3d 1027, 1030 (Colo. 2006). However, if the words are ambiguous, the court may apply other rules of statutory construction and look to legislative history to ascertain intent. See Griffin v. S.W. Devanney & Co., 775 P.2d 555, 559 (Colo. 1989).

Plaintiff argues that Innovative is a "payer of benefits" under C.R.S. § 10-1-135. Plaintiff does not contend that Innovative is an "insurer, health maintenance organization, health benefit plan, preferred provider organization, employee benefit plan, [or] other insurance policy or plan." Rather, plaintiff appears to argue that Innovative falls under the final catch-all category listed under C.R.S. § 10-1-135(2)(c)(I) which states that a "payer of benefits" includes "any other payer of benefits." "Benefits" is defined as "payment or reimbursement of health care expenses [or] health care services . . . provided . . . under a policy of insurance, contract, or benefit plan with an

individual or group, whether or not provided through an employer." Therefore, under these somewhat circular definitions, Innovative is a "payer of benefits" if the medical payments it made for plaintiff were made "under a policy of insurance, contract, or benefit plan."

Clearly the Agreement is not a "policy of insurance" or a "benefit plan" as those terms are commonly used; plaintiff, nor anyone else, paid premiums to Innovative. On the other hand, the Agreement is certainly a "contract" as that term is commonly used, at least in isolation. However, statutory language must be viewed in context and the statute must be read "as a whole, construing each provision consistently and in harmony with the overall statutory design, if possible." Whitaker v. People, 48 P.3d 555, 558 (Colo. 2002). In the context of the overall statutory design of C.R.S. § 10-1-135, it is unclear, under the definition of "benefits," how broadly the term "contract" is to be understood. The statute states that it is a "law regulating insurance and health benefit plans." C.R.S. § 10-1-135(1)(d). Therefore, "contract" could be reasonably read to mean agreements which share similar characteristics to insurance policies and benefit plans. On the other hand, "contract" could be reasonably read to mean a broader type of agreement which may not share the characteristics of an insurance policy or benefit plan. Accordingly, the court finds that "contract" is susceptible to more than one reasonable interpretation, and is therefore ambiguous.

If a court determines that a statute is ambiguous in some material way, the court "may look to extrinsic evidence of intent, including prior law, legislative history, the consequences of a particular construction, and the goal of the statutory scheme." L & R Exploration Venture v. Grynberg, 271 P.3d 530, 533 (Colo. App. 2011).

The fact that C.R.S. § 10-1-135 expressly states that it regulates "insurance and health benefit plans" is strong evidence that the legislature did not intend the law to extend beyond those confines. The legislative history does not reveal any discussion of the applicability of C.R.S. § 10-1-135 beyond insurance and health benefits plans. In addition, "injured party" is defined as a person who "received benefits as a policyholder, participant, or beneficiary from the payer of benefits." C.R.S. § 10-1-135(2)(b). "Policyholder, participant, and beneficiary" are all terms which indicate an intent for the statute to apply to insurance policies and benefit plans, and not something broader.

Accordingly, the court finds that the Colorado legislature intended C.R.S. § 10-1-135(2)(b) to apply to insurance and health benefit plans, including "contracts" which share characteristics with such plans. In this matter, the Agreement cannot fairly be considered to be similar to an insurance policy or benefit plan. Premium payments were not made to Innovative. Indeed, the Agreement was not entered into until after plaintiff was injured, and the Agreement only covered those specific injuries. Insurance policies and benefit plans do not generally operate in such a manner. Therefore, the court finds that C.R.S. § 10-1-135 is not applicable to the Agreement.

**ii. The Dual Representation Agreement**

During the June 13, 2012 hearing, there was some testimony as to the intent of the parties under the Dual Representation Agreement that costs and attorney fees would be shared between plaintiff and Innovative. The Dual Representation Agreement states that "[t]he costs of litigation will either [be] born equally between [plaintiff] and Innovative, or else divided collectively by you both."

"The primary goal of contract interpretation is to determine and give effect to the

intention of the parties." USI Props. East, Inc. v. Simpson, 938 P.2d 168, 173 (Colo. 1997). "The intent of the parties to a contract is to be determined primarily from the language of the instrument itself." Id. The terms of a contract should be given their plain and ordinary meaning. See Wota v. Blue Cross & Blue Shield of Colo., 831 P.2d 1307, 1309 (Colo. 1992). Extrinsic evidence of the parties' intent is only admissible if there is an ambiguity in the terms of the contract. Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, 577 P.2d 748, 750 (Colo. 1978).

The plain and ordinary meaning of "costs" does not include attorney fees. See Black's Law Dictionary (9th ed. 2009) (defining "cost" as "[t]he charges or fees taxed by the court, such as filing fees, jury fees, courthouse fees, and reporter fees" and "attorney fees" as "[t]he charge to a client for services performed for the client, such as an hourly fee, a flat fee, or a contingent fee"). In addition, a "fee agreement" is mentioned several times in the Dual Representation Agreement, evidencing a distinction between costs and fees. Accordingly, the court finds that the use of "costs" in the Dual Representation Agreement is not ambiguous, and extrinsic evidence as to the parties' intent is not admissible. Under the agreement, the parties agreed to share costs related to the litigation, but not attorney fees.

**iii. Equity**

In addition to her arguments above, plaintiff also makes an argument based on equity and fairness. Specifically, plaintiff argues that under Innovative's position, she will receive little or nothing from the $57,000 settlement, and that result is not equitable.

While the court is sympathetic to plaintiff's situation, it is not entirely accurate to say that plaintiff will receive nothing from the settlement proceeds. Plaintiff received

12

$23,132.50 worth of medical care. While it is certainly understandable that plaintiff feels she should receive something beyond the medical care, the court must enforce the terms of the agreements entered into by plaintiff.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that the Motion for Partial Disbursement of Registry Funds (Docket No. 153) be **GRANTED**, and $23,132.50 be released from the court's registry to Innovative. It is further

**RECOMMENDED** that Innovative submit to the court an affidavit of court costs and attorney fees incurred by Innovative which are related to the Motion for Partial Disbursement of Registry Funds (Docket No. 153). It is further

**RECOMMENDED** that the amount of reasonable attorney fees (to be determined by the court) and one-half of the court costs be released from the court's registry to Innovative.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.**

13

**Makin v. Colo. Dep't of Corr.***,* **183 F.3d 1205, 1210 (10th Cir. 1999);** **Talley v. Hesse***,* **91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Date: July 12, 2012         s/ Michael J. Watanabe
       Denver, Colorado         Michael J. Watanabe
                                      United States Magistrate Judge